# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AMADA EMILIA LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 6516 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Amada Emilia Lopez seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§423(d)(2); 1314(a)(3)(A), 216(I) and 223(d)(2). Ms. Lopez asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Ms. Lopez applied for SSI and DIB on June 12, 2008, alleging that she had been disabled since April 10, 2005. (Administrative Record ("R.") 13). Her claims were denied initially on September 16, 2008, and upon reconsideration on November 7, 2008. Ms. Lopez filed a timely request for rehearing on December 2, 2008. (R. 86). An administrative law judge ("ALJ") convened a hearing on November 13, 2009. (R. 13), at which Ms. Lopez, represented by counsel, appeared and testified. (R. 13). Cheryl Hoiseth testified as an impartial vocational expert ("VE"). On December 23, 2009, the ALJ issued a decision denying Ms. Lopez's applications because he found that Ms. Lopez would be able to perform past relevant work as a clinical counselor. (R. 15-21). This became the final decision of the Commissioner when the Appeals Council denied Ms. Lopez's request for review of the decision on August 23, 2010. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Lopez has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

# I.
# THE EVIDENCE

## A.
## The Vocational Evidence

Ms. Lopez was born on September 26, 1955, making her fifty four years old at the time of the ALJ's decision. (R. 158). She has a college degree in professional counseling. (R. 33). She last worked as a clinical counselor, a job that involved sitting for the majority of the day meeting with clients and occasionally lifting 10 pounds or less. (R. 33). That job ended when Ms. Lopez elected to stop working after she says she began developing pain and had difficulty concentrating. (R. 34-35). Before that, she worked as a Second Language Tutor, also sitting for the majority of the day and lifting less than ten pounds. (R. 170). Prior to her tutoring job, Ms. Lopez worked as a punch press machine operator in a factory. (R. 170).

## B.
## The Medical Evidence

The medical record discloses that prior to the alleged onset date of April 10, 2005, Ms. Lopez had cervical spine surgery in 2004 and bilateral carpal tunnel surgeries in early 2005. (R. 295-96, 363-64, 372-74, 376-78, 385, 398). On April 14, 2005, Alfred Akkeron, M.D., performed an initial orthopedic evaluation regarding Ms. Lopez's complaints of right shoulder and neck pain, as well as a neck mass. (R. 379-80, 393-94). Dr. Akkeron observed essentially full range of motion of the right shoulder and neck. (R. 379, 393). An x-ray revealed a possible dislocation of the right clavicle joint. (R. 379, 393). An MRI revealed a rotator cuff tear; x-rays showed mild arthritis in her wrists. (R. 292, 395-97). Dr. Akkeron performed primary rotator cuff repair surgery and a neer acromioplasty the following month. (R 366-67).

Richard Shin, M.D., saw Ms. Lopez in consultation on June 28, 2005 and stated that she had "progressed satisfactorily" following surgery on both wrists. Following her second appointment on July 1, 2005, Dr. Shin observed adequate wrist range of motion and discharged her. (R. 372-74, 398). In his report he indicated that Tinel's sign over cubital tunnel was negative on the right, notable because they would generally be positive in an individual with carpel tunnel syndrome. (R. 373);

http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm.

Following this evaluation, the administrative record contains no treatment accounts for three years. Mrs. Lopez admitted that she did not seek any medical care from 2005 to 2008. Then, on July 2, 2008, Dr. Otto Garcia Montenegro ("Dr. Garcia"), the plaintiff's family doctor, (R. 354, 357), again saw Ms. Lopez. There is no treatment note for this visit. On July 10, 2008, Dr. Garcia completed an Arthritic Report and a Spinal Disorders Report in support of Ms. Lopez's application for disability benefits. In the Spinal Disorders Report, he diagnosed Ms. Lopez with osteoporosis of the lumbar spine. (R. 357-58). Dr. Garcia stated that Ms. Lopez's ambulation was normal; her spinal range of motion was nearly normal; she could sit, stand, or walk for two hours at a stretch, but then said she needed to alternate positions every hour. (R. 357-58). Dr. Garcia said that Ms. Lopez could perform normal lifting and carrying of ten pounds. (R. 358).

Dr. Garcia's Arthritic Report noted next to the heading "Diagnosis(es)": neck pain and s/p [status post] C5-C6 laminectomy and decompression. (R. 354). On that form, Dr. Garcia noted that Ms. Lopez's ambulation was normal, that she could sit or stand for three hours – not two as he said in the Spinal Disorders Report – at a stretch and added that she needed to alternate positions hourly. (R. 355-56). Dr. Garcia said that Ms. Lopez had decreased range of motion of the upper extremities secondary to pain; decreased grip strength in both hands; significant limitations doing repetitive reaching, handling, fingering, grasping, turning, and twisting; and difficulties holding utensils and performing shoulder level and overhead reaching. (R. 354-55). Finally, he noted that Ms. Lopez said that she felt that all her symptoms got worse after having her earlier surgeries.

On August 11, 2008, C.J. Wonais, M.D., performed a consultative evaluation for the Bureau of Disability Determination Services. (R. 310-12). Dr. Wonais observed that Ms. Lopez's gait was normal; she could ambulate without aid; the range of motion of all joints was normal except for the lumbar spine and right shoulder; straight leg raises resulted in pain in both knees; and a neurological examination was normal, including fist and grip strength. (Ms. Lopez claimed she could not make a fist, and her wrists felt like they

were breaking)(R. 48, 212). She complained of constant pain in her hands and difficulty in opening jars and gripping, and inability to button her clothes. (R. 311). Regarding her "mental status," Dr. Wonais noted that Ms. Lopez wept during most of the examination; any type of activity seemed to cause her a significant amount of pain, and she claimed not to know the difference between a tree and a bush. Dr. Wonais' impression was status post cervical laminectomy, repair of right rotator cuff tear, and bilateral carpal tunnel release; pain in multiple joints; osteoporosis of the wrists; and depression. (R. 311-12). But Dr. Wonais expressed doubt that Ms. Lopez was genuinely cooperating in the examination process, noting: "cooperation was questionable." (R. 311).

On August 21, 2008, Francis Vincent, M.D., completed a Physical Residual Functional Capacity Assessment form, indicating the following limitations: occasionally and frequently lifting and carrying ten pounds; standing, walking, and sitting each for about six hours; limited pushing and pulling in the upper extremities; occasionally climbing, stooping, kneeling, and crouching; limited reaching, handling, and fingering; and avoiding concentrated exposure to extreme cold, and vibration. (R. 302-09).

On September 15, 2008, Kirk Boyenga, Ph.D., completed a Psychiatric Review Technique Form, indicating these limitations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 313-26). Dr. Boyenga noted that all of the medical records related to physical illness, with the exception of a pre-alleged onset notation in 2004 of a prescription for Xanax. (R. 323).

On September 30, 2008, Dr. Garcia saw Ms. Lopez. His "Progress Notes" reflect complaints of right shoulder pain, right clavicle pain, right elbow pain, bilateral wrist pain, bilateral knee pain, bilateral ankle pain, and he noted osteoporosis of the lumbar spine. (R. 327). He noted another physician prescribed Tylenol with codeine for pain associated with her hysterectomy; it was apparently not intended to treat her back and neck pain. (R. 327).

On October 31, 2008, Richard Bilinsky, M.D., completed a Physical Residual Functional Capacity

Assessment Form, indicating the following limitations: occasionally lifting and carrying twenty pounds; frequently lifting and carrying ten pounds; sitting, standing, and walking each for about six hours; occasionally climbing ramps and stairs; never climbing ladders, ropes, and scaffolds; occasionally stooping; and limited reaching above shoulder level with the right arm. (R. 331-38).

### C.
### The Administrative Hearing Testimony

#### 1.
#### Ms. Lopez's Testimony

Ms. Lopez testified that she was a "professional counselor" with a Master's degree from Concordia University. (R. 56). As a mental health therapist, she worked with groups, families and individuals and helped those who could not afford medical care to enroll in programs that paid for that care. (R. 31-33). She said that she found that she could not prepare progress notes in her cases because her back and shoulders hurt and her fingers were numb. She also claimed to have pain in her legs. In 2004, she had a cervical laminectomy, and in 2005, she underwent surgery on each hand for carpal tunnel syndrome. (R. 34-35). She stopped working because of pain and numbness in her fingers and hands, pain in her back and legs, and inability to concentrate because of the chronic and severe pain. (R. 34).

While she said the pain worsened after the surgeries (R.35, 212) – the disability report submitted in support of her claim for benefits stated she was constantly in pain after the surgeries (R. 188) – she admitted that she did not seek any medical treatment between May 2005 and October 2008, when she went to Cook County (Stroger) Hospital (R. 35-36), which provides care regardless of ability to pay. http://www.cchil.org/dom/ cchmission.html.

In Ms. Lopez's July 16, 2008 statement in support of her application for benefits, she stated that she could not even get out of the car without assistance because she had no strength in her arms and had constant pain in her back and knees. She could not rise from a chair or sofa because of the pain, and she did not have the strength in her hands to push herself up. (R. 203). She said she needed help from her family even to

shower and dress. (R. 204). She could not, she claimed, drive, button anything, pull her shirt up and down, wash her hair, or do dishes. She could not, she said, even trim her nails. (R. 204-206).

She could not stay in any position comfortably for more than one hour, and she had to "constantly" change positions. She could do no household chores or garden. Indeed, she only went outside three to four times per month. (R. 204-208). She was, she said, "always in pain." (R. 208). Her pain was so bad that she couldn't even hold "a book for too long." (R. 209). She felt like her wrists "are going to break." (R. 212). She no longer socializes because she does not have the energy or the motivation. (R. 210). So severe and unremitting was the pain, she claimed, that she was unable to concentrate to the point that if someone gave her some sort of written instruction, she would immediately forget what she was supposed to do. (R. 210). She described her pain as "permanent." (R. 211).

Ms. Lopez repeated all this at the hearing. She testified that she has daily headaches, "constant pain" in her hands, arms and shoulder and that her fingers in both hands are cold and numb. (R. 43-44, 47-50). She has burning sensations and dizziness and electric sensations throughout her body. (R. 48-51). In fact, she said, the discomfort is everywhere in her body and in all her muscles. During the day, she claimed she had to change positions regularly due to her back pain and that she alternates wearing a brace on both hands. (R. 45-47). Ms. Lopez stated that as a result of her constant pain, she is unable to use her hands to open bottles, grip objects, make a fist, type, use the internet for more than five minutes, sit or stand for more than an hour, drive an automobile due to inflexibility in her neck, or walk more than a block. (R. 48-51). She takes Neurotin for pain in her fingers, hands and shoulder. (R. 50-51). She described the sensation as "like a needle" throughout her entire body. She does not have "peace, not in the day, not in the night." (R. 51).

The pain was so bad she said, that "yesterday" when she was "trying to move [her] soup," she was crying with pain. (R. 52). She cannot do laundry, cook, shop, garden, wash dishes, write, type, sleep, or any of the other routine and normal things that make up the daily activities of everyone else. She said that she was unable to use her hands or to sit or to lie down for any but the briefest period without pain. Ms. Lopez

said that she was unable even to button her shirt or to rise from a chair or couch or to grip anything. (R. 50-55). She summed up her condition this way: "I can't do anything." (R. 52).

Her initial explanation for not having seen a doctor between 2005 and 2008 was that she could not afford to get medical care. (R. 25, 36).[1] Dr. Garcia did not *treat* Ms. Lopez in the three-year period between 2005 and 2008, but Ms. Lopez said that Dr. Garcia was her "family doctor" until she began at Cook Count/Stroger Hospital in 2008, and that in the period between 2005 and 2008 she saw him and got "samples" of some unnamed medicine, although she could not remember the dates. (R. 35 – 36). There are no treatment notes reflecting any of this.

Ms. Lopez conceded that her job entailed finding social service programs that would pay for medical treatment for those who could not afford treatment and enrolling them in those programs. She thus knew not only of the existence of social care programs that provided free medical care, she knew how to go about gaining admittance into them. She said however she just could not accept that she was sick:

> "You know, for me – I don't know. It just – but for me it was very hard to accept that I was, you know – because, like I said, I was in pain, but I didn't want to accept that they [sic] were really sick, you know. And I used to help people get into the programs, and for me I didn't know how to do that because it was hard. But when I didn't go to the doctor, I was like taking medicine at home like you can buy . . . like for the pain. And but when I decide really to go because I…couldn't sleep. I couldn't sit for a long time. I couldn't walk and my situation was worse. And I fell down too, and broke my wrist. And because my legs sometimes, they're like weak and numb, my toes, and then I said that I really need attention for my situation."

(R. 36-37).

### 3.
### The Vocational Expert's Testimony

Cheryl Hoiseth, the Vocational Expert ("VE"), testified that Ms. Lopez's past work and relevant other work, such as office helper, information clerk, and counter clerk, could be performed by a hypothetical person

---

[1] If credible, that explanation would account for the protracted failure to seek medical assistance and would preclude the ALJ from being able to use that failure in his assessment of Ms. Lopez's credibility. If not credible, the ALJ's credibility assessment could properly take that into account. *See infra* at 15.

who had the limitations assessed by Dr. Bilinsky. In her view, achievable work-related tasks included lifting twenty pounds occasionally and ten pounds frequently; sitting and standing for up to six hours; pushing and pulling within the weight restrictions given; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally stooping; being limited from doing repetitive reaching above shoulder level with the right arm; and performing fine and gross manipulation. (R. 57-59).

### III.
### THE ALJ's DECISION

The ALJ found Ms. Lopez to have the following severe impairments: status post cervical laminectomy and decompression at C5-C6 and status post carpal tunnel syndrome decompression. (20 CFR 404.1520(c) and 416. 920) (R. 15). The ALJ next determined that these impairments fail to meet or medically equal one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1, giving particular consideration to listing 1.04 for disorders of the spine. (R. 16). Essentially, Ms. Lopez did not present the necessary medical evidence, test results and clinical findings to establish the criteria necessary to meet these listings. (R. 16). Although the ALJ found Ms. Lopez's impairments to be severe, he held that they did not preclude her from completing basic work-related activities. (R. 16).

The ALJ recounted Ms. Lopez's testimony and reviewed the medical record. (R. 16-20). He determined that Ms. Lopez retained the capacity to perform light work. (R. 16).[2] The ALJ also concluded that Ms. Lopez's allegations regarding the extent of the limitations her impairments caused were not entirely credible considering the medical evidence, her course of treatment, and the success of those treatments. The ALJ's analysis of Ms. Lopez's credibility was careful and extended. He found her explanation that she did not seek medical care between 2005 and 2008 because of impecunity and/or an inability to accept that she

---

[2] Light work is defined as: Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

was in need of medical care to be not credible. (R. 18). The ALJ noted that Ms. Lopez knew about programs that provided free medical care and that she had no difficulty in seeking medical care in connection with her cervical laminectomy decompression, the surgeries on her hands, and on her rotator cuff. (R. 17).

Moreover, the ALJ stressed that Ms. Lopez had reported marked improvement following these surgeries and that her doctors had discharged her from their care because of her excellent progress. (R. 17). The ALJ found it significant that the sudden resumption of visits to doctors in 2008, after the passage of three years, coincided with her application for disability benefits. The ALJ also found her claim of debilitating headaches to be not credible, noting that she received no treatment, and that there were no reports of headaches after the onset date and before 2009.

In sum, the ALJ concluded that while Ms. Lopez is "consistent with her complaints, her rendition of her daily activities cannot be accepted as true because there simply is no record to support such complaints of pain." (R. 18). The same is true as to her claim of dizziness, which she said she experiences as a side effect of medication. (R. 18, 50-51).

The ALJ observed that the state agency medical consultants' physical residual functional capacity assessments found that in certain aspects, Ms. Lopez was restricted in her ability to lift or climb stairs or ladders. It was found, however, that she was unlimited in pushing or pulling with her upper and lower extremities. The medical consultant noted that Ms. Lopez's allegations of limited functioning did not accord with the evidence. The reports also concluded that, contrary to the plaintiff's claims at the hearing, she had near normal grip strength. The ALJ noted that these assessments were consistent with the medical evidence as a whole. (R. 19).[3]

The ALJ went on to discuss the opinion of Ms. Lopez's treating/family physician, Dr. Garcia. She

---

[3] The ALJ even took into consideration the third-party Function Report from Ms. Lopez's friend, who noted that her information was necessarily limited since she did not live with Ms. Lopez. (R. 215). The ALJ concluded that the form had limited value in part because it largely reiterated or was dependent upon statements made by Ms. Lopez recounting her claimed difficulties. (R. 216-217). The ALJ did not deem the report sufficient to overcome more probative factors "including the objective medical evidence and the dearth of medical treatment in this record." (R. 19).

assigned little weight to his opinion regarding the level of Ms. Lopez's disability, saying it was inconsistent with the bulk of the medical evidence, and found that the limitations in his July 2008 reports in support of Ms. Lopez's application for benefits appeared to be based upon Ms. Lopez's subjective complaints as opposed to objective medical findings. (R. 16). Specifically, there was no medical evidence indicating Ms. Lopez requires an alternating position or is limited to standing/walking for three hours or less, and Dr. Garcia did not explain the basis for his conclusions. (R. 16).

The ALJ then went on to consider the testimony of the VE. Ms. Lopez's past relevant work as a clinical counselor was light and although it was skilled, she had performed it for long enough to learn the necessary abilities. (R. 18). Because that did not exceed Ms. Lopez's residual functional capacity for light work, Ms. Lopez could still perform such a job as it is generally and normally performed in the national economy. The ALJ concluded that Ms. Lopez was not disabled and not entitled to DIB or SSI. (R. 20-21).

## IV.
## ANALYSIS

### A.
### The Standards Of Review

We review the ALJ's decision directly, but we do so deferentially, *Weatherbee v. Astrue,* _ F.3d _, 2011 WL 3506107, 2 (7th Cir. 2011), and we play an "extremely limited" role. *Simila,* 573 F.3d at 513 -514; *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan,* 988 F.2d 789, 792 (7th Cir. 1993). *See also Weatherbee,* 2011 WL 3506107, 2.[4] If it is, the court

---

[4] To be "disabled" as defined by the Act, 42 U.S.C. § 423(a)(1)(E), a claimant must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant's physical or mental impairment or impairments must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A). *Weatherbee,* 2011 WL 3506107, 2.

must affirm the decision. 42 U.S.C. §§405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).

The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Weatherbee,* 2011 WL 3506107, 2; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila,* 573 F.3d at 513 -514; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Since conclusions of law are not entitled to such deference, where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It is a "lax" standard. *Berger*, 516 F.3d at 545. It is enough if the ALJ "'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability.'" *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

**B.**
**Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila,* 573 F.3d at 512-13; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe,* 425 F.3d at 352. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein,* 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee*, 2011 WL 3506107, 3; *Briscoe,* 425 F.3d at 352.[5]

## C.
### Analysis

Ms. Lopez advances three arguments for reversal or remand. First, she argues the ALJ failed to properly analyze her credibility, especially by drawing inferences from her lack of treatment for a three-year period contrary to Social Security Ruling ("SSR") 96-7p, which precludes an ALJ's credibility assessment to be based on a failure to follow a treatment plan where the claimant has a good reason for the failure or infrequency of treatment. Poverty is such a reason. Second, she submits that the ALJ erred in rejecting Dr. Garcia's clinical findings, contrary to 20 C.F.R. 404.1527(d)(2). Finally, Ms. Lopez claims, without elaboration, that the ALJ failed to build an accurate, logical bridge between the evidence and his conclusion. *See* Plaintiff's Memorandum in Support of Motion for Summary Judgment, 4-10. ("Memorandum").

---

[5] Residual functional capacity is defined as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).

**1.**

Ms. Lopez's objections to the ALJ's assessment of her credibility are unpersuasive. We begin with the basics. The administrative law judge's credibility determination is reviewed with "special deference," *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010); *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 354 (7th Cir. 2005), because the ALJ, not a reviewing court, is in the best position to evaluate credibility, having had the opportunity to observe the claimant testifying. *Jones v. Astrue,* 623 F.3d 1155,1160 (7th Cir. 2010). *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171 (1944) (Jackson, J., dissenting) ("A few minutes observation of the parties in the courtroom is more informing than reams of cold record."). The credibility determination need not be flawless, *Simila,* 573 F.3d at 517, and will be reversed only if is "patently wrong." *Jones,* 623 F.3d at 1162. That occurs only when the determination is "lack[ing] any explanation or support." *Id.* at 1160; *Simila,* 573 F.3d at 517. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue,* 390 Fed.Appx. 581, 587 (7th Cir. 2010).

Social Security hearings are not exempt from the basic axiom of experience that parties and witnesses will exaggerate when it is to their advantage. *Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir. 2009); *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006); *Brown v. Chater,* 87 F.3d 963, 965-66 (8th Cir. 1996). Thus, the "administrative law judge did not have to believe [Ms. Lopez's testimony]." *Sarchet,* 78 F.3d at 307. Her subjective complaints were not required to be accepted insofar as they clashed with other, objective medical evidence in the record. *Arnold v. Bamhart,* 473 F.3d 816, 823 (7th Cir. 2007). Indeed, discrepancies between objective medical or other evidence and self-reports may be evidence of symptom exaggeration. *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005).

In making judgments about the veracity of a claimant's statements about his or her symptoms, including pain, the ALJ, in addition to considering the objective medical evidence, should consider the following in totality: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type,

dosage, effectiveness, and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) *any other factors* concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(Emphasis supplied).  Inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements "*and the rest of the evidence*" are of course significant.  20 C.F.R. §§ 404.1529(c)(4)(Emphasis supplied). *Compare Kadia v. Gonzales,* 501 F.3d 817, 820 (7th Cir. 2007)("'...factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'").

The ALJ's credibility determination regarding Ms. Lopez was faithful to these guides and was carefully reasoned and explained.  Ms. Lopez first sought to account for her three-year gap in seeking medical treatment by claiming that she could not afford to see a doctor.  She conceded that while she "used to help people get into the programs" that provided free medical care, it was "hard" to do it for herself. (*See supra* at 7; R. 36-37).[6] While an inability to afford treatment is one reason that can "'provide insight into an individual's credibility,'" *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008), under SSR 96-7p, an ALJ should consider whether a claimant has access to free treatment.  SSR 96-7p.  Where, as here, there is not a good cause for failure to seek treatment, the failure bears significantly on credibility. *Simila*, 573 F.3d at 519 (the regulations expressly permit the ALJ to consider a claimant's treatment history); *Craft,* 539 F.3d at 679 ("In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment."); *Dixon,* 270 F.3d at 1178-79 (ALJ could have reasonably determined that the claimant's

---

[6] If Ms. Lopez was to be believed, it was "hard[er]" to arrange for free medical care through one of the programs with which she was familiar than to suffer three years of allegedly constant pain.

testimony was not credible based in part on a finding that the claimant's visits to physicians were "intermittent at best"); *Schmidt,* 496 F.3d at 843 ("Schmidt has failed to establish that she suffers from her claimed level of chronic pain because she did not follow through on her physical therapy or pursue pain management."); *Dixon*, 270 F.3d at 1178-79.

Since Ms. Lopez conceded that she knew how to enroll in programs that would have provided free medical care, her claim that she did not have funds to pay a doctor did not, standing alone, preclude the ALJ from utilizing the three year gap in medical care in his credibility assessment. To show that she had good cause for failure to seek treatment despite her access to free medical care, Ms. Lopez claimed she couldn't accept the fact that she was in pain and needed medical help. *See supra* at 7. Not only was this excuse for three years of inaction implausible under the circumstances of this case, it was inconsistent with her prior conduct in 2004 and 2005 when she acted promptly to deal with medical situations infinitely less dire and compelling than that she said confronted her between 2005 and 2008. The ALJ noted that in 2004 and 2005 when Ms. Lopez had neck pain, from what turned out to be a disc problem, had shoulder pain from what turned out to be a torn rotator cuff, and had wrist pain from carpal tunnel syndrome, she had no difficulty in "presenting to her doctors and complaining. . . " (R 18). Accordingly, he found her psychologically based explanation unconvincing and properly rejected it.

The ALJ found further support for his adverse credibility determination in the fact that the objective medical evidence and medical opinions in the record did not support the existence of the extreme limitations Ms. Lopez claimed. (R. 16-19). Although an ALJ cannot ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration. *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz,* 409 F.3d at 804; *Powers v. Apfel,* 207 F.3d 431, 435-36 (7th Cir. 2000).

The medical professionals who examined Ms. Lopez did not find objective manifestations remotely approaching the level of pain and limitations she claimed. (R. 17-19). *See supra* at 6-8. All of the medical

records for the 2004-2005 period in connection with Ms. Lopez's surgeries reflect that they were successful, that Ms. Lopez's recovery was unexceptional, and that she was discharged from the doctors' care because of the uneventful nature of those recoveries. The ALJ noted that one of the post-operative notes showed a negative neurological examination with Ms. Lopez exhibiting "good sensation and strength." The doctor commented that "'it was nice seeing her moving about well here in the office.'" (R.17). The ALJ also observed that when Ms. Lopez was discharged from her hand specialist's care in July 2005, she had no "muscle spasms or tenderness in her extremities" and had "a full range of motion of her neck." (R. 17). Dr. Shin, a treating doctor, reported progressive postoperative healing and a predominately normal range of motion and strength. (R. 17-19).

Even Dr. Garcia's July 2008 report is partially inconsistent with and undercuts Ms. Lopez's claim that because of the excruciating pain, she could not even pick up a gallon of milk, move a bowl of soup, venture outside, or sit or stand more than an hour. *See supra* at 6-8 discussing Ms. Lopez's itemization of the things she claimed she could not do. Dr. Garcia noted that Ms. Lopez's ambulation was normal, and that she could sit or stand for three hours at a stretch.

Dr. Wonais' 2008 consultative evaluation concluded that Ms. Lopez's gait was normal; she could ambulate without aid; the range of motion of all joints was normal except for the lumbar spine and right shoulder; her fist and grip strength were normal, although Ms. Lopez complained of constant pain in her hands and difficulty in opening jars and gripping, including difficulty buttoning her clothes, claiming she needed assistance. (R. 17-18, 311). Dr. Wonais noted that Ms. Lopez wept during most of the examination; any type of activity seemed to cause her a significant amount of pain. Dr. Wonais' impression was that Ms. Lopez was not cooperating in the examination process, noting: "cooperation was questionable." (R. 311).

In August, 2008, Dr. Vincent's Physical Residual Functional Capacity Assessment form, indicated the following limitations: occasionally and frequently lifting and carrying ten pounds; standing, walking, and sitting each for about six hours; limited pushing and pulling in the upper extremities; occasionally climbing,

stooping, kneeling, and crouching; limited reaching, handling, and fingering; and avoiding concentrated exposure to extreme cold, vibration, and hazards. (R. 302-09). Of course, these conclusions were contrary to Ms. Lopez's contention that she could not do anything because of her constant pain. *See supra* at 6-8.

On September 15, 2008, Dr. Boyenga's Psychiatric Review Technique Form indicated that Ms. Lopez had only mild difficulties in maintaining concentration (R. 313-26) – contrary to her claim that she could not even recall a written instruction after reading it, because she could not maintain concentration. (R. 210). *See supra* at 7. On October 31, 2008, Dr. Bilinsky's Physical Residual Functional Capacity Assessment Form stated that Ms. Lopez was able to occasionally lift and carry twenty pounds; frequently lift and carry ten pounds and sit, stand and walk for about six hours. (R. 331-38).

These findings, which are at odds with Ms. Lopez's claims, are significant. *See, e.g., Similia*, 573 F.3d at 518-19 (normal or near normal musculoskeletal exam-strength, range of motion, etc. undermined claimant's credibility); *Sienkiewicz v. Barnhart,* 409 F.3d at 803-04 (complaints of extreme pain were inconsistent with the findings of all the doctors who examined claimant and opined that she had only minimal or moderate limitations). It is simply wrong to say that the ALJ ignored the objective evidence, as Ms. Lopez claims, and it certainly cannot be said that the ALJ's conclusion that the medical evidence did not support Ms. Lopez's claimed limitations is not supported by substantial evidence. Again, as *Schaaf* emphasized, a treating physician's opinion need not be given controlling weight where it is not "supported by substantial evidence in the record." 602 F.2d at 875. Dr. Garcia's opinion falls within this rule.

Ms. Lopez's counsel submitted 14 pages of treatment notes from Stroger Hospital to the ALJ. (Memorandum, Ex. A). The copies in the record and those attached to the plaintiff's brief are in the main, illegible, and two pages are black. ( R. 339-353). Ms. Lopez's opening brief contends that the ALJ ignored these records. He plainly did not, and indeed, referred to the Stroger records (although not by name) when he noted that Ms. Lopez sought "treatment again in 2008, shortly after she applied for disability benefits. . . ." (R. 18). It was not that the ALJ ignored the Stroger records, he simply did not find that they added

anything of moment to her claim or detract from his conclusion that Ms. Lopez's sudden resumption of medical treatment in the Fall of 2008 at Stroger was designed to "benefit her disability claim." (R. 18).

Ms. Lopez's opening brief purports to recite what is in the fourteen pages of notes, but makes no reference to any specific page to support the interpretation, referring instead to the notes *en masse*. (i.e., R. 339-353; Memorandum at 8). The reply brief (at 3) does the same thing. But,"[j]udges are not like pigs, hunting for truffles buried in [the record]." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). Nor are they required to play "archaeologist with the record." *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999). *See also Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010); *Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720-21 (7th Cir. 2008); *Dye v. United States*, 360 F.3d 744, 751 (7th Cir. 2004).[7]

While the reply brief refers to certain medical terms, it makes no attempt to explain what significance those terms have or how they support Ms. Lopez's claim that she is "disabled" within the meaning of the Act. Lawyers are not allowed to play doctor with the record and to make medical determinations about the significance of medical references – as opposed to utilizing obviously understandable references to a broken wrist or claims of numbness and stiffness in one's arms or legs, etc.

Beyond that, neither Ms. Lopez's brief nor reply brief makes any attempt to explain how the notes relating to Ms. Lopez's having broken her wrist on October 19, 2008 – it was then that she went to Stroger – and experiencing pain in connection with that break undercut the ALJ's conclusion that Ms. Lopez was not *disabled* under the Act. (Memorandum at 9). The purported references in the notes to Ms. Lopez's claims of numbness in her fingers and stiffness in her left wrist, etc., echo Ms. Lopez's claims that she made at the hearing and in her application for benefits. In any event, the ALJ did not ignore the notes and made specific reference to them in discussing her seeking treatment in 2008, and in discussing the absence of any

---

[7] The Seventh Circuit often strikes sections of briefs and factual assertions in briefs that lack direct citation to easily identifiable support in the record. *See e.g., Casna v. City of Loves Park,* 574 F.3d 420, 424 (7th Cir. 2009); *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 754 n. 1 (7th Cir. 2006); *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir. 2004).

focus by Ms. Lopez on headaches after the onset date, but before 2009. (R. 17-18).

Finally, the Stroger notes appear to be replete with Ms. Lopez's complaints about her situation.[8] Ms. Lopez's argument about the Stroger notes tacitly assumes the truth of her statements to the doctors and then faults the ALJ for not accepting them at face value. This sort of argument is not only question-begging, but fails to acknowledge that a doctor's notation of a claimed symptom or subjective complaint from the patient is not medical evidence. *Schaaf,* 602 F.3d at 875. It is "the opposite of objective medical evidence." *Id.* And an ALJ is not compelled to accept even a treating physician's opinion based on those assertions. *Id. See also Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008)(ALJ can discount opinion of treating physician if based on the plaintiff's subjective complaints); *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004)("medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."); *Dixon,* 270 F.3d at 1177. It was one of the principles that the ALJ looked to in his analysis of Dr. Garcia's report. (R. 19).

Even assuming that Ms. Lopez's counsel's translation of isolated notations in the notes is correct, the notes paint a less compelling and desperate picture than Ms. Lopez's sought to do in her testimony and application for benefits. To the extent that they reflect limitations, they were essentially adopted by the ALJ. (R. 19). The ALJ gave the "benefit of the doubt" to Ms. Lopez in connection with fine and gross manipulation and certain other limitations, even though he noted that two medical consultants indicated that Ms. Lopez was not credible in certain of her claims because she had near normal grip strength. (R. 19).

Ms. Lopez's suggestion that the ALJ failed to take into account her "daily activities" – Ms. Lopez's was adamant that the intensity and chronicity of her pain effectively prevented her from engaging in any daily activity, *supra* at 6-8 – tacitly assumes that Ms. Lopez's testimony is true. (Memorandum at 5). The ALJ did not ignore her testimony, he merely found it to be grossly exaggerated. (R. 17).

---

[8]One of the Stroger documents that is legible (not part of the 14 pages) quotes Ms. Lopez as saying she was "in great pain." The doctors expressed their "under[standing],"and told her to be patient and that the medication would help her. (R. 241).

The ALJ also rejected Ms. Lopez's assertion that the side effects from medications, in conjunction with her limitations, precluded her from working. (R. 18). Because these allegations are not reflected in the extensive medical record, the ALJ correctly found them not credible. 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv)(type, dosage, effectiveness, and side effects of medication are considered as a factor relevant to a claimant's symptoms).

**3.**

Ms. Lopez's contention that the ALJ failed to give sufficient weight to Dr. Garcia' report is in two parts. The first is that Dr. Garcia's failure to have explained the basis for the limitations he found, rather than being a basis for the ALJ to have under-weighted his opinion, actually was or should have been the trigger for the ALJ to have taken some unspecified action pursuant to his duty to fully and fairly develop the record. (Memorandum at 7). The argument is undeveloped and skeletal. There is only the general proposition that an Administrative Law Judge has a duty to develop the record. But "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting). *See also Daubert v. Merrell Dow*, 509 U.S. 579, 598 (1993)(Rehnquist, C.J., concurring in part and dissenting in part); *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005).

Ms. Lopez bears the burden of supplying evidence to prove her claim of disability. *See Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006); *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004). Although an ALJ has the duty to develop a full and fair record, he is "entitled to assume" that an applicant represented by an attorney is making his "strongest case for benefits." *Glenn v. Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir. 1987). *See also Wall v. Astrue,* 561 F.3d 1048, 1063 (10th Cir. 2009). "The ALJ's duty to develop the record is not so sweeping that it can relieve an applicant entirely of his own responsibility for supporting his claim; instead, the ALJ must exercise some discretion in deciding when and how he should order additional evidence." *Griffin v. Barnhart,* 198 Fed.Appx. 561, 564 (7th Cir. 2006). Courts may only order the Commissioner to take additional evidence 'upon a showing that there is

[1] new evidence which is material and that there is [2] good cause for the failure to incorporate such evidence into the record in a prior proceeding.' *Wall*, 561 F.3d at 1063 (brackets in original). In this case, Ms. Lopez's counsel obviously thought Dr. Lopez's report was adequate or he would not have submitted it in the form he did. In short, no case of which we are aware supports Ms. Lopez's approach, and *Schaaf*, 602 F.3d at 875 refutes it. ("The ALJ discounted [Dr.] Ingalls's opinion about Schaaf missing work because he found that Ingalls did not explain his opinion and his treatment notes do not clarify the doctor's reasoning").

The argument made by Ms. Lopez, if accepted in this case, would have significant and undesirable implications for future cases. *Cf.*, Posner, Cardozo: A Study in Reputation, 118 (1990)("The soundness of a conclusion may not infrequently be tested by its consequences."). No longer would unsupported, conclusory assertions by a doctor be a basis for discounting in some measure the doctor's opinion; henceforth, the substantial discretion an ALJ now has regarding the need to develop the record would be replaced by a rule requiring the ALJ to request further amplification on and explanation of the doctor's conclusory statements.

Moreover, as the ALJ explained, Dr. Garcia's opinion was contradicted by other medical evidence in the record, was dependent upon representations made to him by Ms. Lopez after not having treated her for three years, and Ms. Lopez's credibility was open to the most serious question. Thus, there was nothing that required the ALJ to require further amplification from Dr. Garcia.

The contention that Dr. Garcia's report is not at all inconsistent with the findings of the other medical professionals in the case (Memorandum at 8) is mistaken, as the briefest comparison between his report and the evaluations of the other medical professionals in the case reveals. *See supra* at 3-5. Ms. Lopez's briefs also put out of view the very significant fact that notwithstanding his concerns about Dr. Garcia's report, the ALJ included a limitation in the Residual Functional Capacity as it relates to Ms. Lopez's difficulties of overhead reaching with her right arm, and he gave Ms. Lopez "the benefit of the doubt" regarding her allegations of "limited functioning" in connection with fine and gross manipulation. (R. 19).

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt,* 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005). Obviously, if these conditions are met, there is no basis on which an administrative law judge, who is not a physician, could refuse to accept it. It is equally obvious that once well-supported contradictory evidence is introduced, the treating physician's opinion is no longer entitled to controlling weight. *Hofslien v. Barnhart,* 439 F.3d 375, 376 (7th Cir. 2006). At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377.

In deciding how much weight to accord a treating physician's opinion, the ALJ is to consider various factors, including how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, consistency with the record and other relevant factors. *Id.*; 20 C.F.R. § 404.1527(d). *Scott v. Astrue,* __F.3d.__, 2011 WL 3252799, 5 (7th Cir. 2011). The cases make clear, however, that while the opinion of a "treating physician" may be more informed because he has greater familiarity with the patient, having treated her over time, *Punzio v. Astrue,* 630 F.3d 704, 713 (7th Cir. 2011); *Schmidt,* 496 F.3d at 842, that very involvement carries with it the potential for bias in favor of the patient. "'The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Dixon,* 270 F.3d at 1177. In short, he may "'bend over backwards'" to help a patient obtain benefits. *Punzio,* 630 F.3d at 713. *See also Zeigler Coal Co. v. Office of Workers' Compensation Programs,* 490 F.3d 609, 616 (7th Cir. 2007).

The Seventh Circuit has repeatedly stressed that a treating physician's opinion "is 'not the final word on a claimant's disability,'" *Schmidt,* 496 F.3d at 842, and a claimant is not entitled to disability benefits "simply because her physician states that she is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled." *Dixon,* 270 F.3d at 1177. In the end, "it is up to the [ALJ] to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or. . . the consulting physician, who may bring expertise and

knowledge of similar cases – subject only to the requirement that the [ALJ's] decision be supported by substantial evidence." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1992); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). So long as reasonable minds could differ concerning whether the claimant is disabled, we must affirm the ALJ's decision denying benefits. *Schmidt*, 496 F.3d at 842; *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989).

Here, the ALJ carefully considered Dr. Garcia's July 2008 report for Disability Determination Services. (354-58). In his report, Dr. Garcia opined, *inter alia*, that Plaintiff's ambulation was normal, she could sit, stand, or walk for two or three hours at a stretch, contrary to her claim and she could not sit for more than an hour, that she needed to alternate positions every hour, and that she lacked the strength even to rise from a chair or couch unaided. Dr. Garcia concluded that Ms. Lopez could perform normal lifting and carrying of, for example, ten pounds (she claimed she could not even lift a gallon of milk), but she had significant limitations against doing repetitive reaching, handling, fingering, grasping, turning, and twisting; she had difficulties holding utensils; performing shoulder level and overhead reaching. (R. 354-58). Dr. Garcia endorsed significant limitations without any further explanation. (R. 19).

The ALJ appropriately found that the functional limitations had "little or no support in the medical record" and furthermore were likely based on Ms. Lopez's subjective complaints rather than objective findings. (R. 19). A doctor's conclusions regarding a claimed symptom or subjective complaint from the patient are not medical evidence; they are the "the opposite of objective medical evidence." *Schaaf*, 602 F.3d at 875. Thus, where a doctor's "conclusions about [a patient's] limitations are based almost entirely on [the patient's] subjective complaints rather than objective evidence," the ALJ may discount them. *Ketelboeter*, 550 F.3d at 625; *White,* 415 F.3d at 659; *Rice*, 384 F.3d at 371.

**3.**

Ms. Lopez's contention that the ALJ failed to build an accurate, logical bridge between the evidence and his conclusions is essentially a reprise of the specific arguments discussed above. The decision in this

case is far more comprehensive and explanatory than in many decisions that are sustained on review. The ALJ more than "minimally articulate[d] his reasons for crediting or rejecting evidence of disability." *Clifford,* 227 F.3d at 870. He explained carefully the basis of each aspect of his decision and supported it with evidence in the record.

**CONCLUSION**

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 9/6/11